Jerry Emanuel POLLARD,
Petitioner–Appellant,

v.

Theo WHITE, Warden, Respondent–
Appellee.

No. 95–15772.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 20, 1997.

Decided July 25, 1997.

Matthew I. Kreeger, Morrison & Foerster, San Francisco, CA, for Petitioner–Appellant.

Daniel E. Lungren, Attorney General of California, Clifford K. Thompson, Deputy Attorney General, San Francisco, CA, for Respondent–Appellee.

Before: NORRIS, KOZINSKI and TASHIMA, Circuit Judges.

TASHIMA, Circuit Judge:

Petitioner Jerry Emanuel Pollard appeals the district court's dismissal on the merits of his petition under 28 U.S.C. § 2254. He contends that the California Court of Appeal (CCA) violated his right to a jury trial by reducing his conviction from first to second-degree murder to remedy a harmful trial error, instead of ordering a new trial. He also contends that he received ineffective assistance of counsel when his attorney failed to object to the State's motion to modify the verdict on appeal.

We conclude that, even assuming that the CCA erred in reducing Pollard's conviction to second-degree murder, the error was harmless. We also conclude that Pollard's ineffective assistance argument is without merit because counsel's performance was not constitutionally deficient.

## I. BACKGROUND

On February 20, 1985, Richard and Ursula Hollins drove Ms. Hollins's son, George Anderson, to the Mel–Rey Motel so Anderson could buy back a tape deck he had traded for cocaine. The Hollinses remained in the truck while Anderson went to find Moms, the person to whom he had traded the stereo. Anderson testified that, while he was looking for Moms, Pollard came to the window and loudly told him that Moms was not there and that he should go away. Moms eventually came out of one of the rooms. Anderson asked her for his tape player and Moms informed him that it was no longer in her possession. Pollard then appeared in the courtyard and yelled at Anderson to leave "because if I see you when I come back, your ass is mine." Anderson ran to the back of the motel, jumped the fence, and did not return.

Ms. Hollins testified that after Anderson left, Pollard approached their truck and asked where her son was. She responded that she did not know. Pollard then pulled a gun from his waistband, waved it back and forth, and made threatening remarks. At this point, Moms, her daughter, and another girl came to lead Pollard back to the motel.

As the Hollinses were driving away, Mr. Hollins saw an old friend, Cleophus Hegler, at the auto repair shop near the Mel–Rey. He made a U-turn and parked next to the garage. He got out to speak with Hegler;

Ms. Hollins remained in the truck. Several minutes later, Hegler noticed that a Thunderbird pulled up behind Hollins' truck, and a man with a gun got out and walked toward the passenger side window. Ms. Hollins testified that Pollard pointed the gun at her, and asked where his "stuff" was. When she responded that she did not know, he stated loudly that he would kill her.

Mr. Hollins decided to investigate. As he approached, Pollard told Hollins to stop walking toward him and threatened to "blow [him] away." Before Hollins could respond, Pollard shot him in the left side of the chest, killing him.

Pollard's defense at trial was that the prosecution had the wrong person. During closing argument, Pollard's attorney focused on the many inconsistencies in the testimony of Ms. Hollins, Anderson, and Hegler regarding the identity of the shooter, including what he looked like and what he wore.

The jury was instructed on the elements of first and second-degree murder, as well as voluntary manslaughter. After two and one-half days of deliberations, the jury requested that those instructions be re-read to them. The court did so shortly before lunch. After lunch, the court responded to the following jury request:

> We would like to know if premeditation involves prior thought to the specific victim or prior thought to commit an act of murder in general?
>
> Define premeditation.
>
> Read the instructions/definitions of second-degree murder.

In response to the first question, the court instructed:

> If you were to find that the defendant, with malice aforethought, and with premeditation, and with deliberation, intended to kill either the victim or any member of the victim's party, and that if he formed those mental states of mental malice aforethought, deliberation and premeditation, then if all other elements of first-degree murder are present, the crime would be first-degree murder.
>
> I limited it to members of the victim's party because I assume you don't want to know what might be the case if he intended to kill the garage mechanic or someone across the street. But if I am wrong about that, I guess I can define it further.

The court then repeated the instructions on premeditation, deliberation, and the degrees of murder. The jury returned its verdict 16 minutes after it resumed deliberations. It found Pollard guilty of violating Cal. Pen. Code §§ 187 (first-degree murder) and 12022.5 (use of a firearm). Pollard was sentenced to 32 years to life imprisonment.

On direct appeal, Pollard contended that the trial court gave an improper instruction, which resulted in prejudicial error. The CCA reversed his conviction, because of the incorrect instruction on premeditation.

The State petitioned for rehearing, arguing that *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), did not require a reversal per se, and that the CCA should affirm the first-degree conviction. Alternatively, it contended that the conviction should be reduced to second-degree murder, pursuant to Cal. Pen.Code § 1260,[1] rather

---

1. That section provides:

The Court may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or attempted offense or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependant upon, such judgment or order, and may, if proper, order a new trial and may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances.
Cal. Pen.Code § 1260. Section 1260 "must be read in connection with Penal Code section 1181, subdivision 6." *People v. Romo*, 256 Cal. App.2d 589, 64 Cal.Rptr. 151, 157 (Dist.Ct.App. 1967). Section 1181(6) states:

When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial, in the following cases only:

. . . . .

6. When the verdict or finding is contrary to the law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict, finding or judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed. . . .
Cal. Pen.Code § 1181(6).

than a new trial being granted. Pollard's attorney filed a letter response to the State's motion, arguing for the reversal of the first-degree conviction under *Chapman*, but not explicitly opposing the State's proposal to reduce the conviction to second-degree murder.[2]

The CCA, applying the *Chapman* test to a second-degree conviction, concluded that "the error was harmless beyond a reasonable doubt as to a verdict of second degree murder," and modified Pollard's conviction to second-degree murder. The California Supreme Court denied Pollard's petition for review and a subsequent petition for a writ of habeas corpus.

Pollard then petitioned for habeas relief in the district court, asserting due process, right to jury trial and ineffective counsel claims.[3] The district court denied the writ. This timely appeal followed.

## II. DISCUSSION

■ We review a district court's dismissal of a habeas corpus petition *de novo* and may affirm on any ground supported by the record, even if it differs from the rationale of the district court. *Martinez–Villareal v. Lewis*, 80 F.3d 1301, 1305 (9th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996); *Bonin v. Calderon*, 59 F.3d 815, 823 (9th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 718, 133 L.Ed.2d 671 (1996).

## A. Reduction to Second–Degree Murder

■ It is undisputed that the misdescription of the element of premeditation in this case had a harmful effect on the jury's deliberative process with regard to first-degree murder. Rather than reverse the conviction—the usual remedy for harmful error—the CCA sought to cure the constitutional error by reducing Pollard's conviction to second-degree murder.

Pollard argues that the CCA's decision violated his right to a jury trial because the jury did not necessarily find malice aforethought, an element of second-degree murder. We assume, without deciding, that Pollard is correct, and that it was error for the court to reduce his conviction. However, we conclude that Pollard has not shown that the error was harmful. A careful examination of the record establishes that any violation of his jury trial right was not injurious.

Habeas relief under § 2254 is not warranted unless the trial error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 1721, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *California v. Roy*, —— U.S. ——, ——, 117 S.Ct. 337, 339, 136 L.Ed.2d 266 (1996) (per curiam) ("*Roy II* ").[4] Trial errors that do not meet this test are considered harmless. *Rice v. Wood*, 77 F.3d 1138, 1144 (9th Cir.) (en banc), *cert. denied*, —— U.S. ——, 117 S.Ct. 191, 136 L.Ed.2d 129 (1996).

■ Relying on Justice Scalia's concurrence in *Roy II*, Pollard argues that, in applying the *Brecht* standard in this context, we are precluded from independently exam-

---

2. Pollard's attorney did address the possibility that the court might opt to reduce Pollard's sentence in a footnote:

 We note that if this Court decides to simply reduce appellant's conviction from first degree murder to second degree murder, it will have to decide the issues raised in appellant's supplemental brief[.]

 The supplemental brief referred to argued, *inter alia*, that there was insufficient evidence to establish intent.

3. The district court addressed Pollard's due process and jury trial claims on the merits and concluded that the CCA had lawfully exercised its discretion to modify the verdict pursuant to

Cal. Pen.Code § 1260. It added that federal courts cannot review errors in the state post-conviction review process, citing *Franzen v. Brinkman*, 877 F.2d 26 (9th Cir.1989). The district court also dismissed Pollard's ineffective assistance claim on the merits, concluding that Pollard did not establish that he was prejudiced by his attorney's assertedly deficient performance.

4. *Roy I* refers to *Roy v. Gomez*, 81 F.3d 863 (9th Cir.) (en banc), *rev'd, California v. Roy*, —— U.S. ——, 117 S.Ct. 337, 136 L.Ed.2d 266 (1996) (per curiam). *Roy III* is our decision on remand after *Roy II*. *Roy v. Gomez*, 108 F.3d 242 (9th Cir. 1997) (en banc).

ining the evidence; instead, we are limited to a review of the facts necessarily found by the jury. However, Pollard made this argument without the benefit of our decision in *Roy III*, in which we explicitly rejected Justice Scalia's approach, concluding instead that, when evaluating the harmlessness under *Brecht* of errors of misdescription or omission in jury instructions, we are free to engage in our own review the record. *Roy III*, 108 F.3d at 242. Thus, an error deemed prejudicial under Justice Scalia's concurrence in *Carella v. California*, 491 U.S. 263, 269, 109 S.Ct. 2419, 2422, 105 L.Ed.2d 218 (1989) (Scalia, J., concurring), can nonetheless be harmless under *Brecht*. *Roy III*, 108 F.3d at 242.

Accordingly, in evaluating prejudice under *Brecht*, we can examine, in addition to the findings necessarily made by the jury, the trial record. *Roy I*, 81 F.3d at 871 (Wallace, J., dissenting) (finding error harmless because record established intent to further a robbery); *Brecht*, 507 U.S. at 637–38, 113 S.Ct. at 1721–22 (reviewing the record to find that *Doyle* error was not prejudicial).

Here, the jury's verdict of first-degree murder means that the jury necessarily found that Pollard was the shooter. At trial, the defense did not refute that the shooter explicitly threatened to kill the victim's wife and told the victim that he would "blow [him] away" immediately before shooting him. Rather, the defense argued reasonable doubt as to the shooter's identity. Therefore, when the jury returned a first-degree murder conviction, it necessarily found that Pollard had committed the *actus reus* of the crime.

Further, the evidence is sufficient to establish malice aforethought, either implied or express. Malice aforethought could be established by finding "an intention unlawfully to kill a human being" (express malice) or by finding that the killing was the result of an intentional act that had a high probability of resulting in death (implied malice). Pollard shot the victim at close range in the left side

of his chest, an act that had a high probability of resulting in death. The fact that Pollard stated that he was going to "blow [the victim] away" evidences an intent to shoot when he pulled the trigger; he did not shoot by accident. Thus, at a minimum, the evidence demonstrates implied malice aforethought. Moreover, the defendant's threat to kill the victim's wife and to shoot the victim constitutes sufficient evidence of express malice aforethought.

If the jury had been properly instructed, we are certain that it would have found the malice aforethought required to convict for second-degree murder. The evidence to establish *mens rea* was not refuted by the defense; instead, Pollard merely argued that he did not commit the *actus reus* of the crime. From the first-degree verdict, it is evident that the jury found that Pollard was the shooter and that he shot intentionally and not by accident. In short, given the factual findings that are necessarily implicit in the jury's first-degree verdict, the evidence introduced at trial, and the legal and factual theories asserted by the parties at trial, it is clear that Pollard was not prejudiced by the failure properly to instruct the jury on the malice required for a second-degree murder conviction.

Next, Pollard argues that the instructional error and the subsequent reduction of his conviction to second-degree murder violated his jury trial rights because the errors precluded the jury from finding Pollard guilty of manslaughter. This argument is meritless. A careful review of the instructions given to the jury reveals that the asserted errors did not affect the jury's deliberation with regard to manslaughter. The first-degree murder instruction required that the jury determine that the crime was committed with premeditation and that it was not done in the heat of passion or as a result of a sudden quarrel.[5] The trial error in this case affected the elements of premeditation, deliberation, and, we have assumed, malice aforethought. Howev-

---

5. The jury was instructed that if it found:
 that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation so that it must have

 been formed upon preexisting reflection *and* not under a sudden heat of passion, quarrel, mental disorder or other condition which precludes the idea of deliberation, then it is murder in the first degree. (Emphasis added.)

er, it did not alter the other requirements of first-degree murder, including the requirement that the jury dispel the possibility that the defendant was merely guilty of manslaughter. Thus, when the jury returned a first-degree verdict, it necessarily found that the defendant had not committed the crime in a sudden heat of passion or quarrel.

### B. Assistance of Counsel

■ Pollard claims that his appellate attorney's failure to oppose explicitly the State's motion to modify the verdict was deficient because it forfeited his right to have his due process and right to a jury trial claims addressed under the stricter *Chapman/Carella* analysis used on direct review. He argues that, in addition to arguing for a reversal of his conviction, his attorney should have opposed the State's request for a modification of his conviction to second-degree by arguing that the instruction was also harmful as to second-degree murder. He claims that his attorney could have made this argument under then-existing case law, which allegedly required courts to consider only what the jury necessarily found, while precluding them from independently evaluating the evidence. Pollard also contends that his attorney erred by not requesting a reduction to manslaughter as an alternative to second-degree murder.[6]

The Due Process Clause guarantees a criminal defendant effective assistance of counsel on his first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 391–405, 105 S.Ct. 830, 833–40, 83 L.Ed.2d 821 (1985). Under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's actions so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2063. Pollard must show that his appellate counsel's performance was constitutionally deficient and that it was prejudicial to

his defense. *Id.* at 687, 104 S.Ct. at 2064; *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir.1989). We do not have to evaluate both prongs of the test if the defendant fails to establish one. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

To establish a deficiency in representation, Pollard must demonstrate that his attorney's performance "fell below an objective standard of reasonableness," and that his acts or omissions were not the "result of a reasonable professional judgment." *Id.* at 688 & 690, 104 S.Ct. at 2064 & 2065. The reasonableness of counsel's performance is evaluated as of the time of the conduct and in light of the facts of the case. *Id.* at 690, 104 S.Ct. at 2065.

*Strickland* establishes a strong presumption against judging an attorney's chosen tactics as ineffective because it "could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client." *Id.* In *Miller*, we held that defense counsel does not have a constitutional duty to raise all nonfrivolous issues. *Miller*, 882 F.2d at 1434 n. 10 (citing *Jones v. Barnes*, 463 U.S. 745, 751–54, 103 S.Ct. 3308, 3312–13, 77 L.Ed.2d 987 (1983)). A hallmark of effective appellate counsel is the ability to weed out claims that have no likelihood of success, instead of throwing in a kitchen sink full of arguments with the hope that some argument will persuade the court. *Miller*, 882 F.2d at 1434.

Because it is not at all clear that the argument was available, counsel's failure to argue that the CCA could not weigh the evidence when it modified the verdict from first to second-degree did not fall below an objective standard of competence. Pollard claims that Supreme Court cases at the time supported the proposition that when, because of an instructional error, the jury may not have considered the evidence as to one element of the crime, a court cannot find the

---

6. In response to the State's suggestion that Pollard's counsel's failure to object may have been the result of a tactical decision, Pollard urges us to remand for an evidentiary hearing to determine whether the decision was indeed a tactical

one. However, because our decision is not premised on the tactical nature of counsel's conduct, we need not address Pollard's request for an evidentiary hearing on the issue.

error harmless regardless of how overwhelming the evidence is as to that element.

Pollard is correct that a plurality of the Court so opined in *Connecticut v. Johnson*, 460 U.S. 73, 84–86, 103 S.Ct. 969, 975–76, 74 L.Ed.2d 823 (1983). However, because it was not an opinion of the Court, *Johnson* is not binding. More importantly, as a result of two subsequent cases discussed below, Pollard's counsel had little, if any, reason to believe that he could rely on the *Johnson* plurality's rationale.

At the relevant time, the Court appeared to endorse the notion that an instructional error can be harmless so long as the reviewing court can find that "the record developed at trial establishes guilt beyond a reasonable doubt...." *Rose v. Clark*, 478 U.S. 570, 573, 579 & 583, 106 S.Ct. 3101, 3106, 3108, 92 L.Ed.2d 460 (1986) (citing with approval Justice Powell's view in *Johnson*, 460 U.S. at 97 n. 5, 103 S.Ct. at 983 n. 5 (Powell, J., dissenting), that proper inquiry focuses on how "dispositive" the evidence is as to the relevant element of the crime); *Pope v. Illinois*, 481 U.S. 497, 503, 107 S.Ct. 1918, 1922, 95 L.Ed.2d 439 (1987) (quoting *Rose* standard with approval and concluding that misdescription in jury instruction is harmless "if a reviewing court concludes that no rational juror, if properly instructed, could find [for defendant on the misdescribed element]"). Indeed, the dissenting Justices in both *Pope* and *Rose* viewed the respective majority opinions as allowing a court to find an instructional error harmless "by what amounts to nothing more than an appellate review of the sufficiency of the evidence." *Rose*, 478 U.S. at 590, 106 S.Ct. at 3112 (Blackmun, J., dissenting); *Pope*, 481 U.S. at 508–11, 107 S.Ct. at 1924–26 (Stevens, J., dissenting).

Therefore, at the time the CCA modified Pollard's verdict to second-degree murder, although the issue was not entirely clear, the better view was that Supreme Court caselaw permitted reviewing courts to evaluate the sufficiency and strength of the evidence when determining harmlessness in instructional error cases.[7] It cannot be said that Supreme Court caselaw at that time precluded the type of independent review of the record which is not permitted now under *Chapman* and *Carella*. Therefore, counsel's failure to urge the CCA to confine itself only to the facts necessarily found by the jury when considering the instructional error was not constitutionally deficient.

Pollard also contends that, because the statute pursuant to which the CCA modified his conviction was purely discretionary, his counsel was ineffective in not raising any "serious arguments" against a modification to second-degree murder. However, we already have concluded that failure to raise the *Johnson* argument was not ineffective, and Pollard's attorney did argue that the evidence was insufficient to support a second-degree murder conviction.[8] Pollard has not specified any serious arguments, beyond the *Johnson* and insufficiency arguments, which had a reasonable probability of causing the CCA to exercise its discretion in favor of a new trial (rather than a modification to second-degree). We, thus, conclude that Pollard did not show that his appellate counsel's performance was deficient. *Strickland*, 466 U.S. at 689–90, 104 S.Ct. at 2065–66.

 Next, Pollard claims that his appellate counsel should have urged the CCA to modify the verdict to manslaughter because the record contained sufficient evidence for a reasonable jury to conclude that the crime was committed in the heat of passion or as a result of a sudden quarrel. He points to supposed evidence in the record that the victim was "armed" with a knife when he approached Pollard and that the victim and Pollard had "exchanged angry words." Pollard contends that the trial judge believed there was substantial evidence of manslaughter because he was required by California

---

**7.** Justice Scalia recognized the ambiguity of the older case law in his concurring opinion in *Carella*. 491 U.S. at 267 & 272, 109 S.Ct. at 2421 & 2423 (Scalia, J., concurring).

**8.** As already noted, in his brief before the CCA, Pollard's attorney opposed the reduction to sec-

ond-degree by explicitly referring the court to Pollard's earlier brief, in which the argument was made that there was insufficient evidence to establish the intent required for a second-degree murder conviction.

law to give such an instruction when it is justified by sufficient evidence. He asks us to defer to the trial judge's assessment of the evidence on manslaughter because he was able to evaluate the credibility of the witnesses.

We conclude that Pollard's counsel was not deficient for not arguing for a modification to manslaughter. Our review of the record confirms that there was little evidence to support a manslaughter conviction, and only a serious misreading of the record can support a plausible manslaughter argument. Contrary to Pollard's contention, the victim and Pollard did not exchange angry words; rather, Pollard yelled at the victim and his wife and threatened to kill them. Pollard also fails to mention that the victim was not wielding his knife as he approached Pollard.

Further, Pollard's reliance on the judge's giving the manslaughter instruction is misplaced. The trial judge gave the manslaughter instruction because there was "just barely" enough evidence to justify the instruction: two witnesses described Pollard's behavior as "crazy," from which a jury might have concluded that the defendant could not formulate the intent to kill. However, after defense counsel's closing argument, and out of the presence of the jury, the trial judge stated that if he had known that Pollard's attorney was not going to make a mental disorder argument, except as a passing reference, he would not have given the manslaughter instruction.

In short, Pollard's trial attorney did not present a manslaughter theory to the jury, and the evidence for manslaughter was negligible. The argument for a reduction to manslaughter was thus extremely weak. For that reason, Pollard's attorney was not constitutionally required to raise it. *See Miller,* 882 F.2d at 1434 (appellate counsel not deficient for failing to present claims with no likelihood of success). Pollard was not deprived of his right to the effective assistance of counsel on appeal.

## III. CONCLUSION

Under the standards which govern federal collateral review of state criminal convictions, the district court did not err in denying habeas relief. Accordingly, the judgment of the district court is **AFFIRMED.**